Case No. 21-5122 American Clinical Laboratory Association Appellant v. Xavier Becerra, Secretary, United States Department of Health and Human Services. Mr. Parrish for the appellant, Ms. Neumeister for the appellant. Good morning, your honors. May it please the court, Ashley Parrish for petitioner ACLA. I've asked to reserve three minutes for rebuttal. As you know, this is the second time this case is the court. The first time the court first assured itself of jurisdiction, it held that the statutory bar on judicial review does not apply, and it remanded for the district court to consider the merits of our challenge to the 2016 data collection rule. On remand, the government resurrected a number of jurisdictional arguments that it had abandoned on the first appeal and convinced the district court to dismiss this case as moot. Why? Because it found that the case is bar. We think the district court is wrong, and we're asking this court to reverse. What I'd like to do this morning is focus on really the two issues in the case. First, explain why there is no jurisdictional bar to the court addressing the merits. And then second, urging the court to address the merits by explaining why the 2016 rule is not a reasonable or non-arbitrary and capricious interpretation of the statute. Can I ask one question up front? It's different adjectives. Do we know, at the time of the 2016 rule, how many hospital outreach labs had their own MPIs? I hear a few, some. I hear some from the government, a few from you. Is that just an unknown fact? It's not something anyone could know because it seems somewhat relevant. So, Your Honor, what I understand from the record is that one percent of the hospitals reported, and so I don't know what one percent calculates into an actual number, but I do know that one percent would suggest that it was that percentage of the hospitals that had their own MPIs. Well, unless some of them fell out with the low volume or low cost threshold. That's exactly right, Your Honor, and I don't know if it's in the record, but unfortunately I don't know the answer to your question when you take that into account. Okay, and then a couple things about this 2018 rule. Had anyone, did you or anyone that you're aware of, at the time of the 2016 rule, suggested using this long form CMS 145014XGOP at that point, or did that only first come up for the 2018 rule? My understanding, Your Honor, is that it was brought up in the context of the 2016 rule. Certainly the concept that it was implementing, I don't want to be 100% certain as to whether every jot and tittle was the same because it's a little bit complicated, but essentially that would have been proposed by the laboratories as the approach, which is looking at this in terms of claims rather in terms of... By the labs, does that mean you all? Correct, correct. Okay, maybe on rebuttal, if you can give me a record site or after argument, send in a letter to where you all suggested this form at the time of the 2016 rule. I'd be happy to. Okay, I don't want to distract you with time now. And then just to clarify the 28J letters, so am I right that the fee schedule, the implication of this new statute that extended, once again, the data reporting period, is that the old fee schedule, the one calculated through the process from the 2016 rule, is going to continue now through 2023? Your Honor, I'd like the government to clarify that, but my reading of the data is that now it extends the reporting period through 2023, and it may not be that the rates will take effect until 2025. Okay, okay. They can let me know if they disagree. We've got a different understanding. Okay, I've interrupted you, but go ahead. No, not at all. I want to address the jurisdictional points. Yeah, so... Can you start with the... It's an odd concept of mootness, but we'll just call it the inability to redress argument. Yes, Your Honor. And let me start with that, but in order to sort of put it in context, I think it's helpful to understand what the court said on standing, which is just that when it looked back in 2016, in that decision, it recognized that the 2018 rule had already been passed. It recognized that if we were correct, that there was a redressable remedy for standing purposes. And all our point is is that nothing has changed for purpose of this. So the only way that the government can be correct on this is if it was an advisory opinion before. Now, the reason why the government is not correct on this is that the 2016 rule remains essentially in effect. We asked that the court vacate the 2016 rule, and the court can still do that. Now, that will have consequences, including the consequence that the unlawful rates will have to be changed by the government, but that is what was contemplated all along by this lawsuit. And there's nothing that prevents the court from granting that relief. Happy to sort of go into more detail on that, because I do think you can think about it in a whole bunch of ways. A couple of easy ways to understand why it's not moot is that as of today, we have claims that will have to be paid out, presumably at least till 2023. But in light of the 28 J letter until 2025, what are they supposed to do with those claims? There's also pending claims that have been submitted in the past that haven't been paid out yet. What are they supposed to do with those claims? And they've also been claims that have been paid out in the past over the objections that they were paid out at the wrong rates because the wrong data was collected. Your complaint also asks for a declaratory judgment that the old manner of collecting this data was legally erroneous. And I assume that would still be of value to you in its own right, given that even in the 2018 rule, they said, we're not sure we're sticking with this. In different words, but that was that explicitly that this could all change again if we don't think it's worth the candle. We're not we could back to the old rule. Your honor is absolutely correct. And obviously, our point in the briefing that we emphasize is that it's the government's burden. And it's a heavy burden to show that they won't go back. And there's certainly nothing in the record that would establish that. So even that alone, also shows that it's not moved on its own terms. And with all respect to the district, your your contention counsel, that that notwithstanding the statutory language, we could issue a ruling that that vacates the 2016 rule. And to the extent that claims have been paid out, require those those claims to be, you know, adjusted. Can we go that far? Is that your argument? So your honor, I want to be really careful about answering your question as to what the court would declare versus what would happen. I think that what the court would declare is that the 2016 rule is invalid, because it violates the statute. Either it's arbitrary and capricious, or it's unreasonable. And that that would as a natural consequence mean, as the court found in the first decision, that the agency would have to recollect the data. And then because the existing rates are unlawful, it'd have to do to replace them. I'm not suggesting that the court in its declaratory language would tell the agency how to do that. But that would be the natural consequence. There's nothing unusual about that. For example, this court does not have authority to rule, review internal rules of agency procedure. But if it turned out that a rule of procedure said, you know, we're going to discriminate, and someone brought an action, and you said, you can't discriminate, that might change the rules. You can also think of, for example, the Lucia case with the SEC ALJs, the Supreme Court didn't tell the agency how to fix it. But it's clear that because the ALJs were improperly appointed, that that will have consequences for the decisions that they've issued. It's the same thing here. We're not asking you to actually rule on the rates themselves. But it is true that a natural consequence of striking the 2016 rule is that those will go away. And Judge Wilkins, you've put your finger on the real difference between the two parties. Our position is that Congress allowed for judicial review of the rates, and that that has consequences, sorry, of the rule, and that has consequences later for the rates. And that the government's position is that everything's encased in amber, that no matter whether you review this or not, the rates somehow don't have any, can't be changed by them or otherwise, once they're put in place. And with respect, that's inconsistent with the court's earlier decision. And it just doesn't make sense of Congress's scheme either, which is Congress was limiting what this court could review. It wasn't necessarily saying that the consequences of an unlawful agency action would be forever unremediable. I know I've got a little bit of time. Well, I think to my colleagues, you know, you want to reserve time for rebuttal? Yes. No, I'll give you a one sentence lined up. If there was one other point you wanted to flag. I was just going to thank the court. I'll save my time for rebuttal if that'd be okay. My colleagues don't know for the questions? No, no. Thank you. We'll hear from the government now. Maybe we can start by clarifying the timeframe on the 20HA letter. Did I misunderstand it? That's the most likely answer. Yes, Your Honor. I'll start with that. So my apology that there's any confusion. My statute, as amended, provides that the next reporting period is January 1st, 2023, ending March 31st, 2023. And then the agency would then put new rates into effect beginning January 1st, 2024. Yes, so the following. And I apologize, Your Honor. May it please the court, McCain-Newmeister, for the government. From the beginning of this case, I'm so sorry. This has been noodling in my head. You don't have any different answer on any sort of concrete number on how many hospital outreach labs actually have, or at the time of the 2016 rule, had NPIs? I don't, Your Honor. The number isn't specifically discussed in the rule, and I'm not aware. Did the government have any basis for believing that it was on even a substantial? I'm using substantial in the APA context of less than 50%, but a substantial number, a material number of these? Would it pick that? I'm not. I'm not certain, Your Honor. So from the beginning of this case, there have been two potential kinds of relief that plaintiff could have sought in challenging the 2016 rule. Either wholly prospective relief in the form of the rule's definition of applicable laboratory, or retrospective relief that would change the payment rates established under the statutory scheme. In the prior appeal, the court agreed that plaintiff could challenge the 2016 rule, even though the review bar in subsection H-1 prohibits it from challenging the payment rates. On remand, the district court addressed a different question, whether there remained any effective relief that the court could grant if plaintiff prevailed. Now, at the time of- I'm not saying it would happen, to be clear. There's a whole separate argument on- that's another part of the brief. But if they prevail on their arbitrary and capricious argument, why wouldn't a declaratory judgment that would prevent the government from returning to this method for calculating the payments using the MPIs because of, as in this case presented, the gap in outreach labs that are covered? Why wouldn't that be effective relief, given that the government itself has said, well, we got this 2018 rule. We're not sure we're sticking with it. If it doesn't seem worth the candle, we can go back to the old one. To be clear, what the agency said in the 2018 rulemaking was simply that it could revisit the decision to start using the CMS 1450 type of Bill 14X. The specific thing the agency chose to do in the 2018 rulemaking, it could revisit that. In light of the heavy- we recognize the heavy burden of doing this. We can revisit it and combine that with a brief that says our prior rule was correct. We think that was the best rule. That's right, Your Honor. But it's likely that the agency will return. What is your burden to show for mootness? Respectfully, Your Honor, we disagree with that characterization. For mootness, it's our burden to establish that a case is moot. It is the opponent's burden to establish any exceptions to mootness, as this court has explained. But the voluntary cessation test requires a pretty government- Yes, Your Honor. The court has explained that voluntary cessation is a mootness exception. To show that it's likely that this is going to recur, that's the burden on the opponent to show that the exception applies. I want to give the court a citation for that. The court's court referred to voluntary cessation as an exception and also explained some very helpful things that are relevant to this case about the application of the voluntary cessation doctrine. The court, again, in that case, reiterated the well-established principle that where a rule is rescinded and replaced, that challenges to that rule are deemed moot. In that case, in particular, not only had the rule been rescinded and replaced, the agency subsequently said it was planning to propose a new rule that would repeal or replace the second rule that rendered the challenge moot. The agency specifically explained it was planning- They're planning to replace it with the old rule that they had challenged or a third option altogether. I'm not certain, Your Honor. That matters for voluntary cessation. So, yes. I'm not certain, Your Honor, but the court- We've had other cases where it's been a rule-making and the agency expressed its inclination to reinstate the prior rule and there we found no mootness. Yes, Your Honor. My understanding of that case, and I'll just explain the general facts, that involved a rule whereby roads could not be constructed in national forests and that was the default rule that was being challenged by the state of Alaska. The agency then promulgated a new rule exempting the particular forest at issue from the original rule and then agency said that it was going to propose a rule that would repeal that exemption or replace that exemption. And the court- Something different. Possibly, Your Honor, but it could also have been repealed, in which case it would just go back to the original ruling. If we don't know if it was explicit, that matters. So, the Supreme Court has said, quote, the heavy burden of persuading the court that the challenge conduct cannot reasonably be expected to start up again lies with the party asserting mootness. That's the Supreme Court. So, are you saying that this decision from last fall, just ignored what the Supreme Court said? I don't believe it was very specific. Your Honor, it did refer to this- Do you disagree with what the Supreme Court said there, that the heavy burden of persuading that the challenge conduct cannot reasonably be expected to start up again is with you? This is late, friends of the earth, but there's late law. Your Honor, I'm not aware of any subsequent Supreme Court precedent that would call that into question, so I'm not in a position to dispute that. But I would note there is one other aspect of the court's decision in Alaska v. USDA that is particularly relevant here, Your Honor. And there, the court specifically explained that when you're dealing with voluntary cessation claim with respect to an agency- One second, Your Honor. The court specifically explained, and this is at page 1227 of the decision, that the, quote, the voluntary cessation exception to mootness has no play when the agency did not act, quote, in order to avoid litigation. And so, this court has recognized that the relevant question is whether the agency can be treated as trying to manipulate the judicial process. And that's simply not an inference that can be drawn in the context of this case, Your Honor. And it's helpful to look at the timing of how things progressed. The suit was filed in December of 2017. The proposed rule to revise the definition was issued in July of 2018. That was before the district court even ruled the first time in this case. And in ruling, the district court ruled in the agency's favor. And so, there is simply no adverse ruling that the agency could be treated as being trying to get out of and to manipulate in the context here, which is similar to what the court explained in Alaska v. USDA are circumstances in which voluntary cessation does not apply to agency action. And so, we would submit that that case controls the outcome here with respect to voluntary cessation. Thank you. One last question. Do you agree that redressability, the component of standing, is assessed at the time the complaint is filed? That's correct, Your Honor. And because redressability is assessed at the time the complaint is filed, which is what the court was assessing in its prior opinion, it's important to look at the kind of relief that was available at that time, which we submit there was wholly prospective relief. The definition could have been vacated. The agency could have been directed to go back to the drawing board and come up with a new definition that would apply prospectively in future rate cycles. And that's relief that was available when the suit was filed. Apart from that, what plaintiff seeks now is a form of retrospective relief that is asking that agency be directed, be ordered to collect more data and use that data to adjust the rates that were established. And the statute simply does not permit that kind of relief. Subsection A-1 specifically delineates and controls the reporting periods. I see my time is up, Your Honor. Subsection A-1 specifically delineates the reporting periods, and Congress has very carefully controlled those periods, provided that no reporting can occur before the next reporting period, set very clear deadlines for the next reporting period. Moreover, in subsection B-4B, Congress specifically provided that there can be no adjustment of rates once established, which the Secretary established in this case in November 2017. And Congress's clear desire for continuity, stability, and finality of rates prevents any directing a Secretary to recalculate the rates that have been established. Thank you. I'm sorry I was hogging up your time. Do my colleagues have any questions? No. Okay. Thank you very much. Very helpful. Mr. Parrish, we'll give you the three minutes you asked for. Okay. Your Honors, I'm trying to unmute. I just want to make sure you can hear me. I can hear you. Thank you. Your Honors, I'd like to make three points on rebuttal here. First, about voluntary cessation. Second, about redressability. And then third, on the merits. On voluntary secession, opposing counsel's Alaska case was never cited in the brief, so I can't tell you much about that. I can tell you I'd be surprised if it overturned this court's decision in 2020, which makes clear that it's their burden to make absolutely clear that the conduct won't reoccur. But I'd also point out that it doesn't matter because here, unlike the cases they rely on, and I suspect this is the problem with the Alaska case, is that the effects of the 2016 rule are undoubtedly continuing, which is different from a situation like the Larson case that they rely on where the effects are completely cut off. So either way, they lose on that. Judge Millet, you are absolutely correct. It's assessed at the time the complaint is filed. But I also think that it would be passing strange if this court, when it assured itself of standing that was not really raised in the earlier appeal, that it wouldn't have instantly gone to mootness. And instead, what the court said, if I could read to you, is requiring the secretary to collect more fully representative market data and use it to calculate a new weighted median appears sufficiently likely to increase Medicare reimbursement rates to establish readdressability at this stage. And nothing has changed. It's still the case that that's sufficient, which is the point is that the remedy we seek is a vacatur of the 2016 rule. There are consequences to that, but that is what Congress contemplated by permitting judicial review. There's no way in which these rates are encased in amber and the government can just throw up its hands and say, sorry, they're unlawful, but it doesn't make any difference. And then finally, on the merits, we haven't talked about that because the government really doesn't have anything to say on the merits. It is clear that the statute says, look at each laboratory, look at its revenues and determine whether those revenues, a majority of them come from two specific fee schedules. And the problem here is that the government, instead of taking a look at the revenues for outreach labs that were attributable to those labs, it swept in all of the revenues from the entire hospital, including for open heart surgery and other things, which meant that none of the hospitals, unless they had a separate NPI would qualify. That's clearly not a reasonable or appropriate or non-arbitrary interpretation of the statute. And so we should prevail on that. Your honors, this case was litigated heavily the first time. I think the reason why the government is not supposed to hold jurisdictional arguments in reserve is that they're supposed to all be aired out and fully adjudicated. Mr. Parrish, before you end, I'm sorry, I just had one more question. Oh, please. Yes. Yes. If we assume that we have jurisdiction as you're urging us to do, and if we agree with you that the statute is unambiguous, does that mean that the 2018 rules interpretation is also unlawful? No, your honor, because the 2018 rule addresses this precise problem. So what we've always argued is that the NPI was not fit for purpose because it didn't distinguish between the laboratory's revenues and the larger hospital's revenues. And the 2018 rule gets at that because instead of looking at the revenues as the hospitals of the whole, it looks at specific basically for individual tests. And so what it ends up doing is it teases out the lab tests from the rest of the stuff that the hospital does. No, I understand that, but I guess I'm just trying to focus on the idea that if the statute is unambiguous, then the agency shouldn't be making these kinds of interpretations, right? I mean, it shouldn't. Oh, no. So your honor, we're not arguing that the statute is unambiguous in all of its interpretations and applications. What we're saying is that it unambiguously does not allow them to sweep in the other revenues from the hospital. So we're not suggesting that the agency doesn't have discretion to decide what laboratories are in or out. What we're saying is that what the agency has done here is outside any reasonable interpretation of the language at all and therefore arbitrary and capricious. And it's as if, and I don't mean to be silly about this, just to really make it clear, if the agency had sort of said, we are going to look at what the lab's revenues are, and we're going to do that by just, I don't know, counting how many sunny days there are in July. You would say that's so far out of the range of any reasonableness that can't possibly be a fair interpretation, even if there might be some ambiguity in some other application. That's our point here, which is that it's completely unreasonable to say that when you're trying to figure out the revenues associated with the lab, that you would then take a look at things like open heart surgeries or the other services that the hospital provides, which obviously would dwarf it. And your honor, I point out there's a MedPAC report that was prepared at the request of Congress. And they look at this and they said, well, because they've gone ahead and excluded these labs, those hospital labs are between 45 to 53% higher in rates. And so we know that that exclusion has had a real significant effect. So the court's intuitions that we had pled sufficient for standing, that we actually have concrete injuries here, has been reaffirmed by the government itself in its own congressional report, which is that this decision not to comply with the data collection requirements of the statute has had the effect of both hurting us competitively, that's the first concrete injury, and secondly, resulting in rates that flow from that that are unlawful and unlawfully too low. If my colleagues have no further questions, then the case is submitted. Thank you to council.
judges: Millett, Wilkins, Jackson